948 A.2d 54

**In re Honorable Bruce S. LAMDIN.**

**Misc. JD No. 1, Sept. Term, 2007.**

Court of Appeals of Maryland.

May 13, 2008.

**632**

Alvin I. Frederick (Eccleston and Wolf, P.C.), Baltimore, for Appellant.

Peter E. Keith (Gallagher Evelius & Jones), Baltimore, for Appellee.

Argued before BELL, C.J., RAKER *, HARRELL, BATTAGLIA, GREENE, JJ.

RAKER, Judge.

The Maryland Commission on Judicial Disabilities (Commission), acting pursuant to a Petition for Disciplinary Action filed by special investigative counsel, and after a hearing,

---

\* Raker, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, she also participated in the decision and adoption of this opinion.

recommended that respondent, Judge Bruce S. Lamdin, be suspended for a period of thirty days without pay.

Respondent was appointed as an Associate Judge of the District Court of Maryland in October, 2002. This is his first disciplinary action and there have been no other disciplinary charges filed against him.

## I. Procedural Background

The Commission filed charges against respondent stemming from citizen complaints based upon public comments he made in the courtroom. The Commission charged respondent with violation of Canons 1,[1] 2A, 3B(4), 3B(5), 6A and 6B of the Maryland Code of Judicial Conduct. Md. Rule 16–813.

Canon 1, Integrity and Independence of the Judiciary, reads as follows:

"An independent and honorable judiciary is indispensable to justice in our society. A judge shall observe high standards of conduct so that the integrity and independence of the judiciary will be preserved. The provisions of this Code are to be construed and applied to further that objective."

Canon 2, Avoidance of Impropriety and the Appearance of Impropriety, in pertinent part, reads as follows:

"A. A judge shall avoid impropriety and the appearance of impropriety. A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the impartiality and integrity of the judiciary."

Canon 3, Performance of Judicial Duties, reads, in pertinent part, as follows:

"A. GENERAL RESPONSIBILITIES. A judge shall perform the duties of judicial office diligently, **impartially,**

---

**1.** Respondent has not excepted to any of the findings or conclusions of the Commission. Accordingly, we do not consider whether Canon 1 is a rule of conduct under which a judge may be disciplined, or is instead one which sets out the ultimate objective of preservation of the integrity and independence of the judiciary. *See In re Schenck,* 318 Or. 402, 870 P.2d 185, 214 (1994) (Unis, J. dissenting). Moreover, the Commission found that respondent violated other canons as charged.

and without having or manifesting bias or prejudice, including bias or prejudice based on age, disability, national origin, race, religion, sex, sexual orientation, or socioeconomic status.

B.   ADJUDICATIVE RESPONSIBILITIES.

\* \* \*

(4)  A judge shall be dignified.

(5)  A judge shall be courteous to and patient with jurors, lawyers, litigants, witnesses, and others with whom the judge deals in an official capacity and shall **require** similar conduct of lawyers and of court officials, staff, and others subject to the judge's direction and control." (emphasis retained)."

Canon 6, Compliance, states as follows:

"A.   COURTS.   This Code applies to each judge of the Court of Appeals, the Court of Special Appeals, a circuit court, the District Court, or an orphans' court.

B.   CONSTRUCTION.   Violation of any of the Canons by a judge may be regarded as conduct prejudicial to the proper administration of justice within the meaning of Maryland Rule 16–803(j), as to the Commission on Judicial Disabilities . . . . "

The Commission held a hearing on June 18, 2007.   On that day, respondent and special investigative counsel submitted to the Commission a stipulated verdict sheet, indicating that respondent admitted that his conduct violated all the charges. Respondent and special investigative counsel filed stipulated proposed findings and proposed sanction, urging that "the Commission find by clear and convincing evidence that Judge Lamdin has committed sanctionable conduct,[2] and issue a Public Reprimand . . . . "

---

**2.**  Maryland Rule 16–803(j) defines "sanctionable conduct" as follows:
" 'Sanctionable conduct' means misconduct while in office, the persistent failure by a judge to perform the duties of the judge's office, or conduct prejudicial to the proper administration of justice.   A judge's

At the Commission hearing, respondent appeared with counsel and the Commission was represented by special investigative counsel. Directed towards mitigation and sanction, respondent testified before the Commission, filed letters from friends, professional associates and colleagues attesting to his good character and intentions and change of attitude, and a letter he wrote personally.

The Commission filed an opinion, setting forth findings of fact, conclusions of law and a recommended sanction, finding, by clear and convincing evidence, that respondent violated the Canons of Judicial Conduct, as charged, and thereby committed sanctionable conduct as defined by Maryland Rule 16–803(j). The Commission rejected the parties stipulation for a reprimand and instead recommended that respondent complete a consecutive thirty (30) working day suspension without pay within 90 days of the date of the decision of the Court of Appeals. Neither party excepted to the Commission's opinion. Upon receipt of the Commission's Opinion, this Court set the matter for a hearing.

As we have indicated, respondent did not except to the Commission's findings or conclusions. Instead, he filed a "Waiver of Hearing and Submittal" with this Court, arguing that the Commission's recommendation was extraordinary and might result in unintended consequences, such as a reduction of benefits. Respondent argued, in addition, that his efforts at remediation warranted the imposition of a lesser sanction.

This Court issued an Order scheduling a hearing for respondent to show cause why the Court should not impose the sanction recommended by the Commission or any other sanction permitted by law.[3] Respondent filed a memorandum in

---

violation of any of the provisions of the Maryland Code of Judicial Conduct promulgated by Rule 16–813 may constitute sanctionable conduct."

3. Md. Rule 16–809(e) provides as follows:

"Disposition. The Court of appeals may (1) impose the sanction recommended by the Commission or any other sanction permitted by

response to the Order, arguing that he had shown remorse and had embarked upon a course of corrective conduct, that he had been subject to "unflattering" portrayals by the news media and the public record of the Commission, that a suspension would increase the burden on other District Court judges, and that the Commission's consideration of his perceived demeanor at the hearing was improper.

Pursuant to Article IV, § 4B(b) of the Maryland Constitution, a judge of any court of this State may be disciplined for an established violation of the Maryland Code of Judicial Conduct.[4] The object of the Canons and the accompanying commentary is to set out, for the judiciary and the public, basic standards for the conduct of all judges and to provide guidance in establishing and maintaining high standards of judicial and personal conduct.

Upon our independent review, this Court must determine whether the charges against the respondent are supported by clear and convincing evidence and which, if any, Canons of the Code adopted by this Court have been violated. *See In re Diener and Broccolino*, 268 Md. 659, 670, 304 A.2d 587, 594 (1973). If a violation is found, this Court must then determine what discipline, if any, is appropriate under the circumstances. The decision of this Court shall be evidenced by an Order of the Court, certified under seal and shall be accompanied by a written opinion. Md. Rule 16–809(f).

## II. Factual Findings

The findings of the Commission have not been challenged before this Court. Having reviewed the record, we conclude that the factual determinations set forth in the Commission's findings of fact and conclusions of law are well supported by the record and have been proven by clear and convincing

law; (2) dismiss the proceeding; or (3) remand for further proceedings as specified in the order of remand"

**4.** The Code consists of a terminology section and the Canons, which set forth specific rules of conduct. *See* Md. Rule 16–813, Preamble.

evidence. The Commission Opinion set forth the following findings of fact and conclusions of law:

"FINDINGS OF FACT

"A.    Judge Lamdin was, at all times applicable to the allegations contained in the Charges, a judge of the District Court of Maryland for Baltimore County, District 08. Therefore, the Respondent was and still is a judicial officer whose conduct was and is subject to the provisions of the Maryland Code of Judicial Conduct and Maryland Rules 16–803 through 16–810.

"B.    In the Stipulations of Fact, set forth in Joint Exhibit 1, Tab 2 ('Stipulations of Fact and Violation'), Judge Lamdin expressly admitted that he made each of the comments attributed to him and that those comments violated specific Canons of the Maryland Code of Judicial Conduct, all as set forth in the Charges filed on November 30, 2006, in reference to the following cases:   complaint filed by Ronald Jacobson; *State v. Owens,* # DG 10900; *State v. Marsalak,* # DG 16992;   *State v. McClaughlin,* # C 00240823;   *State v. Kalp,* # C 00239407;   *State v. Nunyez,* # DG 10669;   *State v. Jennings,* # DF 98262;   *State v. Crook,* # C 00239557;   *State v. Jones,* # C 00241933;   *State v. Santos,* # C 00238632; *State v. Stockley,* # C 00237477;   *State v. Spirako,* # C 00222486;   *State v. Nestor,* # C 00240723, and *State v. Holmes,* # C 00228211.

"C.    The following is a listing of those statements and Charges admitted by Judge Lamdin in the Stipulations of Fact and Violation:

"1.    As to the complaint filed by Ronald Jacobson, Judge Lamdin admitted that during the course of his opening remarks for the afternoon docket, he made the following comment to the audience regarding a woman leaving the courtroom with her baby who was crying:

'If she only knew how much I hate kids, she would not have brought that kid in here today.'

"Judge Lamdin further admitted that such comment by him violated Canons 1, 2A, 3A, 3B(4), 3B(5), 6A and 6B of the Maryland Code of Judicial Conduct.

"2. As to *State v. Owens*, # DG 10900, Judge Lamdin admitted that he asked the defendant, Hunter Coleman Owens, from Pennsylvania:

'What's the big rush to get back to Pennsylvania? It's an ugly state.'

"Judge Lamdin further admitted that such comments by him violated Canons 1, 2A, 3A, 3B(4), 3B(5), 6A and 6B of the Maryland Code of Judicial Conduct.

"3. As to *State v. Marsalak*, # DG 16922, Judge Lamdin admitted that, during the course of the case in which defendant entered a not guilty agreed statement of facts to driving while suspended, he asked the defendant:

'Would you like some cheese with that whine because I've heard about all that I wish to hear.'

"Judge Lamdin further admitted that such comments by him violated Canons 1, 2A, 3A, 3B(4), 3B(5), 6A and 6B of the Maryland Code of Judicial Conduct.

"4. As to *State v. McClaughlin*, # C 00240823, Judge Lamdin admitted, upon being informed by the Assistant State's Attorney that the defendant had been asked to remain in the hallway with her baby until her case was called, that he stated:

'Well, you know, I got in trouble because I told some lady we confiscate cell phones and we put the cell phones in plastic bags and send them down to Annapolis. I suggested maybe we ought to do the same thing with children except poke holes in the bag. She filed a complaint against me for that so that's why they keep all of the children out of my courtroom now ... We ordered some plastic bags about five foot tall but they haven't been—they haven't come in yet.'

"Judge Lamdin further admitted that such comments by him violated Canons 1, 2A, 3A, 3B(4), 3B(5), 6A and 6B of the Maryland Code of Judicial Conduct.

"5. As to *State v. Kalp,* # C 00239407, Judge Lamdin admitted that he stated the following to the Defendant during sentencing:

'Now come on James, let's be honest with each other. These problems have existed for you for now—now for 14 years. You must be the slowest study known to man. If you haven't been able to figure out with all of your alcohol related offenses and now your drug arrest that you need to do something to help yourself, come on. Do you think I just came in on the watermelon truck today? ... At Division of Correction they'll spank him and probably release him in four months. Down there he can get all the drugs he wants probably.'

"Judge Lamdin further admitted that such comments by him violated Canons 1, 2A, 3A, 3B(4), 3B(5), 6A and 6B of the Maryland Code of Judicial Conduct.

"6. As to *State v. Nunyez,* # DG 10669, Judge Lamdin admitted that during the hearing he responded to the defendant's request for mercy by stating:

'I don't have any mercy. You haven't heard about me? I am a merciless SOB. You haven't heard that? I thought everybody knew that.'

"Judge Lamdin further admitted that such comments by him violated Canons 1, 2A, 3B(4), 3B(5), 6A and 6B of the Maryland Code of Judicial Conduct.

"7. As to *State v. Jennings,* # DF 98262, Judge Lamdin admitted that, angry with the defendant's attitude, he sent the defendant to lockup and when the case was recalled later in the day, Judge Lamdin asked the defendant's attorney:

'Did he get his head out of where he had it inserted earlier today, Mr. Chase?'

"Judge Lamdin further admitted that such comments by him violated Canons 1, 2A, 3B(4), 3B(5), 6A and 6B of the Maryland Code of Judicial Conduct.

"8. As to *State v. Crook*, # C 00239557, Judge Lamdin, in a case in which defendant entered a guilty plea to possession of paraphernalia and driving without a license, admitted that he made the following comments during the case:

'Why did you drive so poorly? Smoke a little weed before you got behind the wheel? . . . Smoke a little crack before you got behind the wheel? . . . Well, you've got the appropriate last name. . . . All right crack head, Crook. . . . You've got your money all tied up in the next shipment that's coming in? Never mind. . . . My comment was, do you have all your money tied up in product?'

"Judge Lamdin further admitted that such comments violated Canon 1, 2A, 3B(4), 3B(5), 6A and 6B of the Maryland Code of Judicial Conduct.

"9. As to *State v. Jones*, # C 00241933, Judge Lamdin, in a case in which defendant entered a not guilty agreed statement of facts to driving while suspended, admitted that he made the following comments during the case:

'Well Mr. Jones, the hits keep coming. I mean, if there is a pile of shit there you'll step in it . . . Because when you sleep with dogs you generally wake up with fleas and you've been scratching the better part of your life. . . . Date du jour—Going by the bowling alley to pick her up. She's messed up on drugs and I'm sure you were probably contributing to that. . . . You gave her money to go cop whatever she's hooked on . . . So he's just a huge burden to everyone. . . . So am I doing the tax-payers justice by locking this stupid ass up for additional time or am I just punishing the taxpayers? But is he one of the biggest dumb asses I've ever seen? Absolutely. . . . My guess is, released he will surely step in the next pile of shit with another week or two . . . give you an opportunity to find your big pile and step in it again. . . . I could give some time to get money together to pay a fine, but then I'd punish your children and they are already punished enough by

having you for a father. . . . They're dealing with the bottom of the deck right now. . . . Get your head out of where it has been inserted for the last number of years.'

"Judge Lamdin further admitted that such comments by him violated Canons 1, 2A, 3B(4), 3B(5), 6A and 6B of the Maryland Code of Judicial Conduct.

"10. As to *State v. Santos*, # C 00238632, Judge Lamdin admitted, after the defendant requested that his case be transferred to Circuit Court for a jury trial, that he stated the following:

'I didn't even know they had afternoon hours in the Circuit Court. . . . They are usually done by lunchtime and then they take the rest of the day off.'

"Judge Lamdin further admitted that such statement by him violated Canons 1, 2A, 3A, 3B(4), 6A and 6B of the Maryland Code of Judicial Conduct.

"11. As to *State v. Stockley*, # C 00237477, Judge Lamdin admitted, after the defendant's request for a postponement was denied and defendant prayed a jury trial, that he made the following statements:

'That's Judge Turnbull's new ruling, if it's after eleven o'clock it's the next day. They don't like to overtax themselves up there. . . . After eleven o'clock it's Judge Turnbull's new ruling is that jury trials are the next day.'

"Judge Lamdin further admitted that such statement by him violated Canons 1, 2A, 3A, 3B,(4), 6A and 6B of the Maryland Code of Judicial Conduct.

"12. As to *State v. Spirako*, # C 00222486, Judge Lamdin admitted, in a case in which the defendant had not been brought down from Circuit Court, that he made the following statements:

'Don't they come before we do? I know in their own minds they do, certainly. . . . You want me to see if I can prevail on them to bring her down here today? . . . I mean, they don't work in the afternoon up there.

Why is she still up there? ... They're all on their way to have cocktails or something up there at the Circuit Court. Yeah, they don't work in the afternoon. Who are they kidding.... She's in jail in this case? ... I know they're not working up there this afternoon. If they are, I'd like to know which judge it is. It's a shock if it's anybody other than Judge Cahill.'

"Judge Lamdin further admitted that such statements by him violated Canons 1, 2A, 3A, 3B(4), 6A and 6B of the Maryland Code of Judicial Conduct.

"13. As to *State v. Nestor,* # C 00240723, Judge Lamdin admitted, in a case in which the defendant entered a not guilty agreed statement of facts to malicious destruction of property and the defendant's mother, the victim of the criminal act, asked the judge to put her son in a drug treatment program, that he made the following comments:

'I understand your cry for help.... My guess is also that at one time you offered in the past to pay for his treatment.... You got the wrong Judge today. I am not one of those touchy feely judges that goes for programs where everyone holds hands and sings kum ba ah and then they hand out lollipops to each other and gift certificates. I don't believe in that drug court and all that other foolishness.... You know, I don't feel like it's the responsibility of the taxpayers to take care of every damn drug addict on the street.... So I think jail has a telling effect on some people ... especially if they are young and dumb like your son is ... I probably wasn't as big an ass as you were all that time either.... If you want to go up there and ask that judge up there, you know they've got a lot more of those touchy feely judges up there. You'll probably find one of them that will do what you are asking me to do."

"Judge Lamdin further admitted that such comments by him violated Canons 1, 2A, 3A, 3B(4), 3B(5), 6A and 6B of the Maryland Code of Judicial Conduct.

"14. As to *State v. Holmes,* # C 00228211, Judge Lamdin admitted, in a case in which defendant entered a not guilty agreed statement of facts to a charge of assignation, and defendant also had a detainer in Baltimore City, that he made the following comments during the case:

'Who put up your bond money for you, your pimp? ... Business must be good.... If I were to release you, you'd be scratching that itch tonight.... Ma'am you can't bullshit a bullshitter.... You may be able to get some crack down there.... Never know about Charm City. Those guards down there provide services for services.... I should just let you go to Baltimore City, they'll give you the key to the city and then send you on your way.... They don't do anything to them for prostitution down in Baltimore City, they give them one of those BELIEVE stickers to put on their backs.... They don't care about prostitution in Baltimore City. They'll move her into one of the diversion courts, spank her and send her on her way.... You've got no big hurdle in Baltimore City. They treat prostitution like spitting on the sidewalk ... and when you get down there you can pray a jury trial and you're guaranteed to have it dismissed when you go up to the Circuit Court.... They'll toss that thing in Baltimore City, just pray that jury trial.'

"Judge Lamdin further admitted that such statements by him violated Canons 1, 2A, 3A, 3B(4), 3B(5), 6A and 6B of the Maryland Code of Judicial Conduct.

"D. The following are findings of the Commission with regard to Judge Lamdin's sworn testimony and demeanor at the Hearing:

"1. The comments made by Judge Lamdin set forth in the Stipulations of Fact and Violation were undignified, discourteous, and disparaging.

"2. During his sworn testimony at the Hearing, Judge Lamdin admitted that his stipulated comments were

'wrong,' but never indicated any appreciation of exactly what was 'wrong' about those comments. Judge Lamdin did not acknowledge that his comments were, in fact, undignified, discourteous, and disparaging. Judge Lamdin expressed no remorse for his comments; instead, he attempted to justify his comments through explanations and excuses. In response to questions from members of the Commission, Judge Lamdin was generally defensive, sometimes evasive, and, on at least one occasion, arrogant and hostile.

"3. Examples of the aforementioned findings are as follows:

"a. In reference to Judge Lamdin's stipulated comments in *State v. Jennings,* # DF 98262 (Paragraph 1.C.7, *supra* ), and *State v. Crook,* # C 00239557 (Paragraph 1.C.8, *supra* ), Judge Shuger asked Judge Lamdin (1) how he thought a litigant would have felt if those comments were made to him or her by a judge during a hearing, and (2) how he would have felt if he had been addressed by a judge in that manner. Initially, Judge Lamdin did not respond to Judge Shuger's questions. Instead, Judge Lamdin defended his comment in *Jennings,* concluding: 'And I think the comment fit the situation quite frankly at the time regarding Mr. Jennings.' When pressed further for an answer by Judge Shuger, Judge Lamdin responded: 'Well, in the Jenning's (sic) case I certainly would have thought I had it coming. Because to be that unconcerned about your fellow man, that leaves something to be desired. Or fellow woman, in this case.'

"Regarding *Crook,* Judge Lamdin stated:

'And in Mr. Crook's case I was trying to get on a level with him so that he could understand what we were talking about. That he had a problem he hadn't addressed, because it was getting worse instead of better. His life was spiraling out of control and without some kind of treatment, without approaching his life in a different direction, there were going to be additional victims, additional problems.'

'And so if someone was trying to shock me back into reality and get me out of the situation I found myself in, I don't know that I would necessarily be offended.'

"Finally, Judge Lamdin identified one of the reasons for his comments in both cases as 'at times it was my way of handling people one on one.'

"In his responses to Judge Shuger's questions, Judge Lamdin gave no indication that he understood that his comments were undignified, discourteous, and disparaging. He offered no expression of remorse. Judge Lamdin attempted to justify his use of vulgarity, insults, and sarcasm as somehow being a way to communicate with defendants such as Mr. Jennings and Mr. Crook.

"b. In reference to Judge Lamdin's stipulated comments in *State v. Nunyez* # DG 10669 (Paragraph 1.C.6, *supra*) and *State v. McClaughlin,* # C 00240823 (Paragraph 1.C.4, *supra*), Judge Lamdin defended his comments as an attempt at humor. In *Nunyez,* Judge Lamdin claimed that his comments were taken 'out of context,' while in *McClaughlin* he admitted that his attempt at humor was 'a mistake on my part.' Judge Lamdin, however, never expressed remorse, nor did he acknowledge that his disparaging comments about children in *McClaughlin* might lead the public to believe that he was biased or prejudiced against children.

"c. In reference to Judge Lamdin's stipulated comments in *State v. Jones,* # C 00241933 (Paragraph 1.C.9, *supra*), Judge Lamdin testified to the following explanation for his comments:

'I was speaking directly to this gentleman whose situation was such that I had to speak to him directly in terms that he could understand, because I think in that particular case, he couldn't understand why I wasn't going to give him probation.

\* \* \*

'He asked me to explain to him my reasoning behind the sentence, and my best way that I could get down

and get to him in terms he could understand, and I think if I'm not mistaken, this was the last case on the docket that day. There was no one else in the court-room but he, and I, and his public defender, was the way I couched it to him, that he was confused, his thinking was confused in not accepting the four month sentence, as opposed to four year's worth of probation because I felt sure that he would violate it. And I broke it down in terms he could understand.

\* \* \*

So my mistake in this case was trying to talk to this gentleman in terms he could surely understand so there would be no mistake about it, the reasoning for my sentence.'

"Judge Lamdin, however, did not admit to any 'mistake' in the use of profanity, vulgarity, and insults. Again, he expressed no remorse for his comments.

"d. Commissioner Hinton asked Judge Lamdin direct-ly what, if anything, in his comments in *Jones* or in any of his stipulated comments, did he find to be 'offensive or upsetting or disparaging.' Judge Lamdin avoided an-swering the question by stating: 'I certainly wouldn't use the language that I used in that fashion again.' He then admitted that what he had said was 'wrong' and had taken the necessary efforts 'to change myself.' Again, Judge Lamdin did not specify what was 'wrong' about his com-ments.

"e. In response to questions from the Commission Chair, Judge Lamdin finally agreed that, in making state-ments to defendants in open court, the use of profanity, vulgarity, and name-calling was inappropriate. The fol-lowing colloquy then ensued:

'JUDGE WOODWARD: And those are the things that you are not doing now?

'JUDGE LAMDIN: What I am doing now that I didn't do before, I'm taking them back in chambers to talk.

'JUDGE GREENBERG: I'm sorry, I didn't hear what you said.

'JUDGE LAMDIN: I'm taking them back in chambers, back with their lawyer and the prosecutor and talk to them one on one, usually with a treatment advisor.

'And I've done that with representatives of (INAUDIBLE) and I find that to be much more effective. Because I can find out where their true desire is and whether they really want treatment or help, or they're a lost cause. And if they're a lost cause there's not much time to be wasted on talking to them.'

"It is unclear to the Commission exactly what Judge Lamdin meant by his last response. Did he intend to continue using profanity, vulgarity, and name-calling, only now 'back in chambers,' or did he simply want a setting more conducive to finding out whether he could help a particular defendant? The Commission truly hopes that it is the latter. Nevertheless, Judge Lamdin's answer is disturbing to the Commission.

"f. Commissioner Shelton asked Judge Lamdin several questions concerning Judge Lamdin's stipulated comments about the Circuit Court in *State v. Santos*, # C 00238632 (Paragraph 1.C.10, *supra* ), *State v. Stockley* # C 00237477 (Paragraph 1.C.11, *supra* ), and *State v. Spirako*, # C 00222486 (Paragraph 1.C.12, *supra* ). Judge Lamdin was arrogant and hostile in answering the questions posed by Commissioner Shelton. This characterization can best be exemplified by setting forth the transcript of the exchange between Judge Lamdin and Commissioner Shelton:

'MR. SHELTON: Well, did you really want the public to think that the Circuit Court judges drink in the afternoon?

'JUDGE LAMDIN: Well, once again, I'm not going to try to defend what I said. I've already admitted I was wrong. *But I don't know how long since you've been in Baltimore County Circuit Court, Mr. Shelton.* If

you go up in there in the afternoon, there's hardly any activity going on. That's the fact. A lot of judges sitting around there with nothing to do.

'MR. SHELTON: Well, let me ask a different question, your Honor, if someone appeared before you today after your meeting with these judges, would you tell them that the Circuit Court judges drink cocktails in the afternoon?

'JUDGE LAMDIN: I beg your pardon?

'MR. SHELTON: Would you tell today a person that appeared before you that the Circuit Court judges are spending the afternoon drinking cocktails?

'JUDGE LAMDIN: No, of course not. But after it's out there and you said it, you can either admit that you were wrong, you can't bottle it back up. You can learn from your mistake, you can change, or you can stand steadfast and do nothing.

'MR. SHELTON: *Just one final question on page seven—*

'JUDGE LAMDIN: *Are you suggesting it would have been better to do nothing?*

'MR. SHELTON: *I'm not making any suggestions, your Honor. I was just asking.*

'JUDGE LAMDIN: *Well, was there some other way that you think would have been more appropriate for me to deal with it other than consult with three people I respect and get their opinions?* ' (Emphasis added)."

Instead of the proposed public reprimand, the Commission recommended unanimously that Judge Lamdin be suspended without pay for 30 days. The Commission noted as follows:

"Judge Lamdin's sworn testimony and demeanor at the Hearing, in which he failed to indicate an appreciation of the inappropriate nature of his comments, responded in a defensive, evasive, and arrogant manner, and expressed no remorse for his conduct, calls into question Judge Lamdin's basic understanding of the seriousness of his violations of

the Code of Judicial Conduct, as well as his capacity to comply with the Code in the future. The Commission is mindful of the efforts made by Judge Lamdin to correct his behavior ... Nevertheless, the Commission is concerned that, without the imposition of appropriate discipline, the apparent change in Judge Lamdin's behavior will be only temporary."

## III. Analysis

We have independently reviewed the record and find that the Commission's findings of fact and conclusions of law are supported by clear and convincing evidence. We agree with the Commission and Respondent's stipulation that Respondent violated Canons 1, 2A, 3A, 3B(4), 3B(5), 6A and 6B of the Maryland Code of Judicial Conduct.

Canon 3 provides that a judge must perform judicial duties with dignity, courtesy, and patience, as well as without manifestation of bias or prejudice towards any group. We need not repeat here all the conduct set out by the Commission in the findings of fact and conclusions of law, and to which respondent has admitted. Respondent's inappropriate demeanor and comments were exhibited in a pattern of behavior over a period of time and in many cases. His conduct was prejudicial to the administration of justice, manifested bias towards many groups, and lacked dignity, courtesy, and patience. It is patently obvious that use of vulgarity in the courtroom impairs the integrity of the Judiciary and is conduct prejudicial to the administration of justice. Criticism of judicial colleagues, particularly from the bench in the courtroom, hardly leads to trust and confidence by the public in the Judiciary. A judge's lack of courtesy to defendants creates the appearance of impropriety. At the Commission hearing, respondent remarked that his comments had been taken "out of context" and that his comments were made in an attempt to relieve the defendant's nervousness at appearing in court. Even if the comments were delivered in a joking manner, it is difficult to imagine a context in which such remarks would be

appropriate or consistent with behavior that promotes public confidence in the impartiality and integrity of the Judiciary.

■ The Florida Supreme Court considered the conduct of a judge charged with "overbearing and dictatorial" courtroom conduct. In determining that the judge's conduct violated Canon 3 of the Code of Judicial Conduct, the Florida Supreme Court stated as follows:

"The public can have little confidence in the impartiality of a decision when the litigant is cut short in the presentation of her case and the decision maker's demeanor bears all the indicia of prejudice and a closed mind.

We take this opportunity to remind ourselves as judges that tyranny is nothing more than ill-used power.... A litigant, already nervous, emotionally charged, and perhaps fearful, not only risks losing the case but also contempt and a jail sentence by responding to a judge's rudeness in kind. The disparity in power between a judge and a litigant requires that a judge treat a litigant with courtesy, patience, and understanding. Conduct reminiscent of the playground bully of our childhood is improper and unnecessary."

*In re Eastmoore*, 504 So.2d 756, 757–58 (Fla.1987). The inherent imbalance of power between a judge and a defendant mandates that defendants be treated with utmost professional courtesy and explains why certain attempts at humor, grounded in derision of a defendant, may not only fall flat, but also contribute to the erosion of the public perception of the Judiciary.

Use of vulgar and profane language erodes the public trust and confidence in the Judiciary. The language used by respondent was unacceptable for a judge in a judicial proceeding. Respondent's explanation before the Commission was that he "had to speak to him directly in terms that he could understand, because I think in that particular case, he couldn't understand why I wasn't going to give him probation...." No matter how frustrated or stressed a judge may be, a judge should not use vulgar or offensive language in the courtroom or in the performance of judicial duties. Such use of profanity

undermines the public perception of the Judiciary. An effort to connect with a defendant through the use of profanity does nothing but communicate "the message to the Defendant that it is permissible for the Court to say things that if said by the Defendant would be punishable." *In re Sadofski*, 98 N.J. 434, 487 A.2d 700, 705 (1985).

■ Trust and confidence in the judicial system is undermined when a judge disparages and undermines fellow members of the judicial system. Respondent made comments repeatedly that denigrated his fellow judges. He disparaged the Division of Corrections, insinuating that a defendant might receive inappropriate leniency if sent there. Respondent's comments undermined the judicial system repeatedly. We agree with the Commission that respondent's repeated, inappropriate, statements and behavior in the courtroom constituted conduct prejudicial to the proper administration of justice, and violated Canons 1, 2A, 3A, 3B(4), 3B(5), 6A and 6B of the Maryland Code of Judicial Conduct.

## IV. Sanction

■ Art. IV, § 4(b) of the Maryland Constitution provides that the Court of Appeals, "upon a finding of misconduct while in office, or of persistent failure to perform the duties of the office, or of conduct prejudicial to the proper administration of justice, may remove the judge from office or may censure or otherwise discipline the judge." The Commission recommended that respondent be suspended from office, without pay, for a period of thirty consecutive work days. While the Commission's recommendation is entitled to great weight, it is incumbent upon this Court to make an independent assessment of the appropriate sanction. *In re Diener and Broccolino*, 268 Md. at 683, 304 A.2d at 600.

■ It is the constitutional responsibility of this Court to fashion judicial discipline in a manner that preserves the integrity and independence of the Judiciary and reaffirms, maintains and restores public confidence in the administration of justice. Any sanction must be designed to discourage

others from engaging in similar conduct and to assure the public that the Judiciary will not condone judicial misconduct. Judicial discipline is not to punish. The goal of the canons of judicial conduct "is to hold the office of judge above suspicion of abuse of power." *In re Welch*, 283 Md. 68, 72, 388 A.2d 535, 537 (1978). Judicial discipline is "not for purposes of vengeance or retribution, but to instruct the public and all judges, ourselves included, of the importance of the function performed by judges in a free society." *In re White*, 264 Neb. 740, 651 N.W.2d 551, 566 (2002). As we have stated repeatedly, both in judicial discipline matters, as well as attorney discipline matters, our considerations are "the maintenance of the honor and dignity of the judiciary and the proper administration of justice rather than the punishment of the individual." *In re Turney*, 311 Md. 246, 257, 533 A.2d 916, 922 (1987); *see also In re Diener and Broccolino*, 268 Md. at 670, 304 A.2d at 594 (1973); *c.f. Attorney Grievance v. Harris*, 403 Md. 142, 166, 939 A.2d 732, 746 (2008). The sanction must inform the public that we recognize that there has been judicial misconduct, must be sufficient to deter the offending judge from repeating the conduct in the future, and must be sufficient to deter others from engaging in similar conduct.

We turn to the Commission's recommended sanction of a thirty-day suspension without pay. Respondent characterized the Commission's recommended sanction as "an extraordinary circumstance that may have significant unintended consequences" and that the Commission was motivated improperly by personal dislike of him, based on respondent's demeanor at the Commission hearing. As an appropriate sanction, respondent suggests a reprimand and a surrender of fifteen days vacation.[5] In the alternative, he suggests that if this Court

---

5. It is important to note what respondent did *not* argue. Respondent did not and does not challenge the authority of this Court to impose a thirty day suspension without pay. At the show cause hearing before this Court, respondent's counsel was asked as to his view with respect to the constitutionality of the Commission's recommendation, and in particular, the recommendation that the sanction be thirty days without pay, as well as this Court's authority to impose that sanction. Respon-

imposes a suspension without pay, because of collateral effects on benefits, this Court should order respondent to surrender his net paycheck to the Comptroller of the Treasury, Maryland Volunteer Lawyers Service or any other organization deemed appropriate by this Court. As mitigation, respondent pointed to his time on the bench, no prior disciplinary action against him, his efforts to reform his behavior (including seeking out mentors), letters written on his behalf attesting to his changed behavior, the bad publicity and humiliation he has suffered as a result of negative media coverage, the potentially increased burden on the District Court system if he were suspended, and his repeated expressions of remorse for his past actions.

Respondent asks this Court to consider as a mitigating factor the media exposure of his actions and the additional burdens on fellow District Court judges that would result from his suspension. We do not find this argument persuasive. The media exposure mentioned by respondent, including news articles in The City Paper and The Baltimore Sun, worsen public perception of the Judiciary. *See, e.g., In re: Lee*, 933 So.2d 736, 749 (La.2006) (weighing extensive media coverage of a judge's failure to file timely expense reports as an aggravating factor).

Respondent did make efforts to mitigate his behavior by seeking guidance from his colleagues and undergoing voluntary monitoring when the Judicial Disabilities Commission charges were brought to his attention. Despite these efforts, respondent appeared to the Commission as defensive, arrogant, hostile, and evasive. The Commission found that respondent's explanations of his behavior reflected a failure to

---

dent's counsel forthrightly responded that this Court *has* the authority to impose suspension without pay. He stated as follows:

"I believe it does because I was fully aware of the constitutional provision and researched it and you'll notice I didn't raise it and do not raise it now. . . . There are no plans to collaterally attack it." Counsel represented to the Court that respondent was present in the courtroom and that he was authorized to speak for him and bind him on this issue.

demonstrate "an appreciation of the inappropriate nature" of the sanctionable conduct he had committed. The Commission was in the best position to evaluate respondent's demeanor and we do not find their observations to be clearly erroneous.

After a careful, independent review of the entire record, we conclude that the sanction recommended by the Commission is appropriate and respondent should be suspended for thirty consecutive work days, without pay. Weighing respondent's conduct, his attempts at mitigation, and his behavior at the Commission hearing, considering the findings and conclusions of the Commission, and taking into account the serious nature of respondent's conduct, we determine that neither a reprimand nor removal from office are warranted. We conclude that the appropriate discipline in this matter is the sanction recommended by the Commission, that of a consecutive, thirty working-day, suspension without pay is the appropriate sanction.

Several of our sister states have imposed a sanction of suspension without pay. The Supreme Court of Michigan imposed a suspension without pay for one year in a disciplinary matter where the judge had made repeated injudicious, offensive and profane comments from the bench, including comments that were disparaging of the judicial system. *In re Bennett*, 403 Mich. 178, 267 N.W.2d 914, 918–20 (1978). The Supreme Court of Arizona suspended a judge without pay for the balance of his term because the judge had used racial epithets and other vulgarities from the bench. *In re Goodfarb*, 179 Ariz. 400, 880 P.2d 620, 623 (1994). The Supreme Court of Ohio suspended a judge for six months without pay because of false and disparaging remarks he made about the decision of an appellate court in a custody case during a taped interview for a television broadcast, remarks he made about an administrative judge's handling of juvenile matters in a newspaper article, and disparaging remarks about a juvenile administrative judge and the director of community services. *Office of Disciplinary Counsel v. Ferreri*, 85 Ohio St.3d 649, 710 N.E.2d 1107, 1108–10 (1999). *See also Lee*, 933 So.2d at

751 (finding a judge's accounting irregularities and delay in issuing opinions warranted a suspension for 120 days without pay); *In re Empson,* 252 Neb. 433, 562 N.W.2d 817, 822–33 (1997) (finding a judge's offensive and unwelcome contact with female staff, dissemination of religious materials inside the courthouse to jurors and contact with witnesses against him prior to disciplinary proceedings warranted six month suspension without pay); *In re Kneifl,* 217 Neb. 472, 351 N.W.2d 693, 696 (1984) (finding a judge's arrest for drunk driving and his contact with the county's attorney on behalf of a friend arrested for drunk driving warranted suspension without pay for three months).

*FOR THE REASONS SET FORTH, HEREIN, JUDGE BRUCE S. LAMDIN IS HEREBY SUSPENDED WITH-OUT PAY FOR A PERIOD OF 30 CONSECUTIVE WORK DAYS COMMENCING MAY 19, 2008. COSTS TO BE PAID BY JUDGE BRUCE S. LAMDIN.*